IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESHEEM T. HASKINS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LOUIS FOLINO, ET AL. | : | NO. 13-6901 |

## MEMORANDUM

**Padova, J.**                                                                                      **April 18, 2017**

Before the Court is Esheem T. Haskins' Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  United States Magistrate Judge Timothy R. Rice has filed a Report and Recommendation that recommends denying the Petition in its entirety.  Haskins has filed objections to the Report and Recommendation.  For the reasons that follow, we overrule Haskins' objections, adopt the Report and Recommendation as set forth herein, and deny the Petition.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 2006, Haskins and Jerome King were convicted by a jury of first-degree murder and criminal conspiracy in connection with the February 2, 2005 shooting death of Nathaniel Giles.  <u>Commonwealth v. Haskins</u>, 60 A.3d 538, 540, 543-44 (Pa. Super. Ct. 2012).  The evidence admitted at their trial showed that, on the night of February 2, 2005, two young women, S.T. and F.J., went to a Chinese takeout on the corner of Stillman and Cambria Streets in Philadelphia to purchase food.  <u>Id.</u> at 541 (quotation omitted).  While they were waiting for their food to be prepared, they observed Giles speaking with Khalief Alston outside the takeout.  <u>Id.</u> (quotation omitted).  S.T. and F.J. then saw a car driving on Stillman Street stop at the corner of Stillman and Cambria Streets and make a left turn onto Cambria Street.  <u>Id.</u> at 550.  They then saw two men walking on Cambria Street, traveling away from the direction the car had driven

towards the corner of Stillman and Cambria Streets.  <u>Id.</u> at 542 (quotation omitted).  As the two men neared Giles, "Alston ran off" and "[o]ne of the men yelled 'Shoot him.  Shoot him.'"  <u>Id.</u> at 550.  The other man shot Giles in the head; then shot Giles a second time.  <u>Id.</u>  Everyone, including S.T. and F.J., then fled the scene.  <u>Id.</u> at 542 (quotation omitted).  S.T. and F.J. identified King as the shooter and Haskins as the man who yelled "'Shoot him.  Shoot him.'"  <u>Id.</u> at 550.

F.J. went with her aunt to give a statement to Homicide detectives immediately after the crime.  <u>Id.</u> at 542 (quotation omitted).  S.T. went to speak to Homicide detectives with her mother on February 23, 2005.  <u>Id.</u> (quotation omitted).  F.J. and S.T. both returned to the Homicide Division on March 14, 2005 and April 16, 2005 to provide additional information about the murder.  <u>Id.</u> at 542 (quotation omitted).

A special agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives testified at trial that, approximately six months prior to his murder, Giles told him that he had purchased a handgun for King that had been used to kill a ten-year-old.  <u>Id.</u> at 541 (quotation omitted).  There was also evidence at trial that, on April 9, 2005, Detective Ron Dove saw King and Haskins in the neighborhood of the murder and that both King and Haskins were wearing "stop snitching" t-shirts.  <u>Id.</u> at 542 (quotation omitted).  Detective Dove arrested King and Haskins for the murder of Giles on May 6, 2005.  <u>Id.</u> at 543 (quotation omitted).

Dr. Bennett Preston, the Philadelphia Medical Examiner who performed the autopsy on Giles, testified at trial that "the gun that killed the victim was fired from within two feet of the victim's head.  [He] explained that this was a maximum distance between the gun and the head, but opined that it was more than likely a lot closer than that, maybe a foot."  <u>Id.</u> at 551 (quotation and citation omitted).

Alston testified at trial as the only defense witness.  Id.  He was "a friend and gang colleague of both King and Haskins."  Id. at 543.  He testified that Giles was killed by Ernest Cannon, not King or Haskins.  Id. (citation omitted).  Alston claimed that he was walking on the street with Cannon when Cannon saw Giles, walked up to Giles, "and shot him in the head from six to eight feet away with a nine millimeter handgun."  Id. (citation omitted).

On cross-examination, the prosecutor questioned Alston about Alston's March 11, 2005 arrest for an unrelated homicide.  Id.  On that date, both Alston and Cannon were arrested for participating in the same homicide and Alston was interrogated by the police.  Id.  The police told Alston during his March 11, 2005 interrogation "that Cannon had identified him as the actor in at least two murders.  After hearing this, Alston identified Cannon as the perpetrator of [Giles's] murder . . . ."  Id.  "The [prosecutor] extensively cross-examined Alston regarding his motive to fabricate a story accusing Cannon, a man whom Alston believed lied about Alston's participation in unrelated murders."  Id. (citation omitted).  The prosecutor used this cross-examination "to develop an impression for the jury that Alston created the story implicating Cannon only after learning that Cannon turned on Alston."  Id.  The trial court explained that "[a]fter extensive cross-examination on this point, confidence in Alston's story was destroyed and a substantial implication arose that he had merely lied to police and told them Cannon was the shooter in an effort to get back at Cannon."  Id. (alteration in original) (quotation omitted).  King and Haskins were both convicted of first-degree murder and criminal conspiracy and sentenced to life imprisonment on the murder conviction and a consecutive twenty to forty year sentence for conspiracy.  Id. at 543-44.  King was also convicted of carrying a firearm in Philadelphia and sentenced to a concurrent term of imprisonment of one to five years on that count.  Id. at 544.

King and Haskins both appealed and the Pennsylvania Superior Court affirmed their convictions. Id. Haskins filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied on September 9, 2008. Id. Haskins filed a Post Conviction Relief Action ("PCRA") Petition on November 9, 2009. Id. An attorney was appointed to represent Haskins but, believing that Haskins' claims lacked merit, he filed a no merit letter with the PCRA Court and moved to withdraw as counsel. Id. at 544-45. The PCRA Court then appointed a new attorney for Haskins who filed an amended PCRA Petition on January 4, 2011, adding a claim that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose to the defense a letter written by Alston. Id. at 545. The letter, which was seized from Alston's home after his March 11, 2005 arrest, included the following statement: "'cousin Ezel rocked Nate for snitching on lem too.'"[1] Id. Since the letter was in Alston's home at the time of his March 11, 2005 arrest, it was written before Alston told police during his March 11, 2005 interrogation that Cannon, rather than King or Haskins, had murdered Giles. Id. On July 5, 2011, the PCRA Court held a hearing on Haskins' PCRA Petition (in which King had joined). Id. During the hearing, the Commonwealth informed the PCRA Court that the Assistant District Attorney who prosecuted King and Haskins had been given a copy of Alston's letter prior to the trial and had "read the letter and stored it in his trial folders." Id. at 546 (citation omitted). "The ADA never turned the letter over to the defense. The letter did not become known to the defense until Alston provided it to Haskins in prison, at some point after Haskins was convicted." Id. (citation omitted).

The PCRA Court "concluded that the Commonwealth's failure to disclose Alston's letter constituted a material Brady violation, particularly because the ADA argued to the jury that

---

[1]"Ezel" is Cannon's nickname. Commonwealth v. Haskins, 60 A.3d at 543. Alston testified at trial that King used the nickname "Lemon." (6/21/06 N.T. at 107-08.)

Alston fabricated the claim that Cannon committed the murder only after finding out that Cannon blamed him for other murders." Id. (citation omitted). The PCRA Court ordered a new trial for King and Haskins. Id. (citation omitted). The Commonwealth appealed and, on October 12, 2012, the Superior Court reversed, concluding that, while the Commonwealth should have turned Alston's letter over to King and Haskins, the letter was not material for Brady purposes. Id. at 546, 550, 552. Haskins filed a petition for allowance of appeal of this decision, which was denied by the Pennsylvania Supreme Court on October 29, 2013. Commonwealth v. Haskins, 78 A.3d 1090 (Pa. 2013).

Haskins filed a timely Petition for Writ of Habeas Corpus with this Court on November 26, 2013, and subsequently filed several motions for stay and abeyance while he filed a second PCRA Petition in state court. His second PCRA Petition was dismissed on November 20, 2014, and on January 26, 2015, he filed a motion asking that we remove the stay and permit him to file an amended petition. We granted the motion and he filed an Amended Petition for Writ of Habeas Corpus on February 27, 2015. The Amended Petition for Writ of Habeas Corpus asserts one claim for relief: that the prosecutor violated Haskins' 14th Amendment right to due process under Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995), by suppressing material evidence crucial to the credibility of a defense witness (the Alston letter) and by knowingly misrepresenting material facts to the jury in violation of Napue v. Illinois, 360 U.S. 264 (1959) and Miller v. Pate, 386 U.S. 1 (1967).

In a thorough and well-reasoned Report and Recommendation, Magistrate Judge Timothy R. Rice recommends that we deny this claim for relief in its entirety. Haskins has filed Objections to the Report and Recommendation.

## II.    STANDARD OF REVIEW

Where a habeas petition has been referred to a magistrate judge for a report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The Court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Pursuant to 28 U.S.C. § 2254, a petition for habeas corpus may be granted only if (1) the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained the two components of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13. In order to determine whether a state court's application of federal law is "'unreasonable,'" a court must apply an objective standard, such that the relevant application "may be incorrect but still not unreasonable."  Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001) (quoting Williams, 529 U.S. at 409-10).  The test is whether the state court decision "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent."  Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999) (*en banc*).

With respect to § 2254(d)(2), "'[f]actual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.'" Dellavecchia v. Sec'y Pa. Dep't of Corrs., 819 F.3d 682, 692 (3d Cir. 2016) (alteration in original) (quoting Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000)).

## III.  DISCUSSION

Haskins objects to three of the Magistrate Judge's Recommendations:

(1) the Magistrate Judge's recommendation that the standard of materiality used by the Superior Court with respect to his Brady claim was not contrary to clearly established federal law;

(2) the Magistrate Judge's recommendation that his argument that the Superior Court's decision was contrary to clearly established federal law because it did not utilize the standard for materiality enunciated in Napue v. Illinois, 360 U.S. 264 (1959), is both procedurally barred and without merit; and

(3) the Magistrate Judge's recommendation that the Superior Court did not base its decision on an unreasonable determination of the facts or an unreasonable application of federal law to those facts.

### A.  The *Brady* Materiality Standard

In his Amended Petition for Writ of Habeas Corpus, Haskins contends that the Superior Court's rejection of his argument that the prosecutor's failure to turn over the Alston letter violated his 14th Amendment right to due process under Brady was contrary to clearly established federal law.  In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution." Brady, 373 U.S. at 87. "To establish a Brady violation, it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006) (citing United States v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005)). In Kyles, the Supreme Court explained that evidence is material as that term is used in Brady if there is:

> a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). Consequently, "'[t]he materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.'" Johnson v. Folino, 705 F.3d 117, 129 (3d Cir. 2013) (quoting Rocha v. Thaler, 619 F.3d 387, 396 (5th Cir. 2010)). "Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for Brady purposes." Id. (citing Rocha, 619 F.3d at 396-97). "Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration." Id. (citing Rocha, 619 F.3d at 397).

### 1. The Superior Court's decision

The Superior Court found that the prosecutor violated his duty under Brady by failing to turn the Alston letter over to counsel for King and Haskins. Haskins, 60 A.3d at 549. The Superior Court also recognized that the Alston letter would have been helpful to the defense,

because the prosecutor's failure to give the letter to King and Haskins "permitted the ADA to create the false impression at trial that Alston fabricated the claim that Cannon murdered the victim only after learning that Cannon fingered him for at least two other murders" and that King and Haskins could have impeached "this line of attack on Alston's credibility" if they had known of the letter.  Id. at 550.  However, the Superior Court concluded that there was no Brady violation because the letter was not material.  Id. at 552.

The Superior Court explained that its materiality analysis required "consideration of whether, had the defense been in possession of Alston's letter at trial, Alston's credibility would have been rehabilitated to such a degree that the outcome of the trial could have been different." Id. at 550.  The Superior Court concluded, after "reviewing the evidence it its totality," that "had the Commonwealth turned the letter over to the defense, there [was not] a reasonable probability that the jury would have acquitted King and/or Haskins."  Id. at 551.  The Superior Court explained that it based this conclusion on S.T.'s and F.J.'s unequivocal identifications of both men, their knowledge of both King and Haskins from the neighborhood, and their clear views of the men during Giles's murder.  Id.  The Superior Court further concluded that "had the defense been in possession of the letter, Alston's credibility would not have been rehabilitated to the point of overcoming the clear and consistent testimony of the two disinterested witnesses and the supporting physical evidence" for the following reasons:  (1) at the time of trial Alston was facing prosecution in "two murder cases, an attempted murder case and two robbery cases," all involving the use of a firearm; (2) Alston's membership in the "'Lemon Squad,'" the gang led by King, of which Haskins was also a member; (3) Alston's admitted loyalty to King and Haskins; (4) the differences in Alston's testimony regarding the murder from the testimony of S.T. and F.J., specifically regarding the number of men who approached Giles when he was shot and the

manner in which those assailants left the scene; and (5) the significant differences between Alston's testimony that the shooter shot Giles from six to eight feet away and Dr. Preston's testimony that the shooter was one to two feet from Giles.  Id. at 552 (citation omitted).

Haskins argued in his Amended Petition that the Superior Court's determination that the Alston letter was not material was contrary to clearly established federal law because the Superior Court applied a materiality standard that was more stringent than, and thus contrary to, the Brady standard.  The Magistrate Judge recommended that the Superior Court's application of the materiality standard was objectively reasonable.  (R&R at 18.)  Haskins objects to this recommendation on the ground that the Superior Court's decision relied on "more stringent measures of materiality than those clearly set forth in governing United States Supreme Court law." (Objs. at 2.)  Specifically, Haskins argues that the Superior Court added two requirements to the Supreme Court's standard for determining the materiality of a Brady violation and that these requirements substantially altered his burden of proof.

2.      The materiality standard used by the  Superior Court

Haskins' argument that the Superior Court added requirements to the Brady materiality standard relies on two statements made by the Superior Court regarding the standard it used. These statements were made by the Superior Court to explain how it applied the Brady materiality standard in the context of Haskins' claim, made in his PCRA Petition, that the prosecutor committed a Brady violation that affected the credibility of a witness.  In the first statement, the Superior Court explained that a failure to disclose evidence pertaining to witness credibility is material for purposes of Brady where the defendant demonstrates "'that the reliability of the witness may well be determinative of [the defendant's] guilt or innocence.'" Haskins, 60 A.3d at 547 (alteration in original) (quoting Commonwealth v. Johnson, 727 A.2d

1089, 1094 (1999)).  In the second statement, the Superior Court explained how the <u>Brady</u> materiality analysis is conducted in the context of a PCRA Petition:  "[w]hen conducting this analysis in the PCRA context, a defendant must establish that the alleged <u>Brady</u> violation 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.'"  <u>Id.</u> (quoting 42 Pa. Cons. Stat. Ann. § 9543(a)(2)(i); <u>Commonwealth v. Copenhefer</u>, 719 A.2d 242, 259 (1998)).

The issue before us, therefore, is whether these statements show that the Superior Court added elements to the <u>Brady</u> materiality standard.  "Interpreting Supreme Court precedent in a manner that adds an additional element to the legal standard for proving a constitutional violation is 'contrary to' clearly established federal law."  <u>Dennis v. Sec'y, Pa. Dep't of Corrs.</u>, 834 F.3d 263, 280-81 (3d Cir. 2016) (citing <u>Williams</u>, 529 U.S. at 393-94, 397).  However, the Superior Court's citation to Pennsylvania law does not, in and of itself, mean that it "'applie[d] a rule that contradicts the governing law set forth in [the Supreme Court's] cases.'"  <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (quoting <u>Williams</u>, 529 U.S. at 405-06).  As the Supreme Court has explained, "[a]voiding these pitfalls does not require citation of our cases -- indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  <u>Id.</u>

As we discussed above, the Supreme Court has explained that evidence that has been withheld by the prosecution "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682.  "'[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . .'"  <u>Johnson v. Folino</u>, 705 F.3d 117, 128-29 (3d Cir. 2013) (alterations

in original) (quoting Kyles, 514 U.S. at 434). Rather, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678).

The standard used by the Superior Court to determine the materiality of withheld evidence that pertains to the credibility of a witness required Haskins to "'demonstrate that the reliability of the witness **may well be** determinative of [his] guilt or innocence.'" Haskins, 60 A.3d at 547 (emphasis added) (quoting Commonwealth v. Johnson, 727 A.2d at 1094). Haskins has failed to explain how this requirement is qualitatively different from the requirement that he show "a reasonable probability that, had the evidence been disclosed to [him], the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Frankly, it's not clear how a prosecutor's failure to disclose evidence that affects the credibility of a witness could "undermine confidence in the outcome of [a] trial," Kyles, 514 U.S. at 434 (quotation omitted), if the reliability of that witness was not important to the jury's determination of the defendant's guilt or innocence.

The PCRA standard that the Superior Court referred to in the second contested statement required Haskins to "establish that the alleged Brady violation 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.'" Haskins, 60 A.3d at 547 (quoting 42 Pa. Cons. Stat. § 9543(a)(2)(i); Copenhefer, 719 A.2d at 259). Haskins has also failed to explain how this requirement is qualitatively different from the requirement that the prosecutor's failure to turn the Alston letter over to him "undermined confidence in the outcome of the trial." Kyle, 514 U.S. at 434.

Accordingly, we conclude that Haskins has not established that the Superior Court's references to Commonwealth v. Johnson, 727 A.2d at 1094, and to the PCRA materiality

standard, 42 Pa. Cons. Stat. § 9543(a)(2)(i), added additional elements to the legal standard for proving a <u>Brady</u> violation such that the standard it applied was "'contrary to' clearly established federal law." <u>See</u> <u>Dennis</u>, 834 F.3d at 280-81 (citing <u>Williams</u>, 529 U.S. at 393-94, 397). We therefore overrule Haskins' objection to this aspect of the Magistrate Judge's Report and Recommendation.

B.    The *Napue* Materiality Standard

Haskins claims that the Superior Court's decision was also contrary to clearly established federal law because that court failed to apply the materiality standard enunciated in <u>Napue v. Illinois</u>. In <u>Napue</u>, the Supreme Court found that the due process clause of the 14th Amendment is violated if a "conviction [is] obtained through use of false evidence, known to be such by representatives of the State." <u>Napue</u>, 360 U.S. at 269 (citations omitted). This is true even if the "false testimony goes only to the credibility of the witness." <u>Id.</u> False testimony is material in the <u>Napue</u> analysis if it "may have had an effect on the outcome of the trial." <u>Id.</u> at 272. Haskins objects to the Magistrate Judge's recommendation that this claim is procedurally defaulted because he did not raise this claim before the Superior Court. He also objects to the Magistrate Judge's determination that the Superior Court's decision was not contrary to clearly established federal law.

1.    Exhaustion and Procedural default

"[H]abeas petitioners must exhaust available state remedies before seeking relief in federal court . . . ." <u>Cone v. Bell</u>, 556 U.S. 449, 465 (2009); <u>see also</u> 28 U.S.C. § 2254(b)(1)(A). "A claim is exhausted if it was 'fairly presented' to the state courts." <u>Nara v. Frank</u>, 488 F.3d 187, 197 (3d Cir. 2007) (citations omitted). A state prisoner fairly presents his federal claim by presenting "the same factual and legal basis for the claim to the state courts." <u>Id.</u> at 198 (citing

Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam)).  Once he has fairly presented his claims, "a state prisoner must 'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.'"  Id. at 197 (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999), and citing Woodford v. Ngo, 548 U.S. 81, 92 (2006)).

Failure to exhaust may be "'excused'" if the "petitioner's claims are procedurally barred under state rules."  Stevens v. Del. Corr. Ctr., 295 F.3d 361, 369 (3d Cir. 2002) (citing Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002); and 28 U.S.C. § 2254(b)(1)(B)(i)).  Haskins cannot raise any previously unexhausted federal claim in state court without filing another PCRA petition.  See Commonwealth v. Yarris, 731 A.2d 581, 586 (Pa. 1999 ("By its own language, and by judicial decisions interpreting such language, the PCRA provides the sole means for obtaining state collateral relief." (citations omitted)); see also Commonwealth v. Charles, No. 314 WDA 2016, 2016 WL 7103957, at *3 (Pa. Super. Ct. Dec. 6, 2016) (same) (citing Yarris, 731 A.2d at 586)).  It would, however, be futile for Haskins to file such a petition at this time because it would be time-barred by the PCRA's statute of limitations, which requires a PCRA petition to be filed within one year after the petitioner's judgment becomes final.  42 Pa. Cons. Stat. Ann. § 9545(b).  Consequently, if Haskins has not already raised his Napue claim before the Superior Court, it would be procedurally barred by state rules and his failure to exhaust this claim would be excused. See Stevens, 295 F.3d at 369 (citations omitted).  However, even if Haskins' failure to exhaust were excused, we could not consider the merits of this claim because it would be procedurally defaulted.  "[C]laims deemed exhausted because of a state procedural bar are procedurally defaulted, and federal courts may not consider their merits unless the petitioner 'establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default.'"

Lines v. Larkins, 208 F.3d at 153, 160 (3d Cir. 2000) (quoting McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999), and citing Coleman v. Thompson, 501 U.S. 722, 731 (1991)).

Haskins objects to the Magistrate Judge's recommendation that his Napue claim is procedurally defaulted because he did not raise it before the Superior Court. Haskins maintains that he fairly presented this claim to the Superior Court. He further asserts that the Superior Court should have used the materiality standard enunciated in Napue because, even though the prosecutor did not use false testimony to convict him, "the prosecutor accomplished the same end through his insistent suggestions to Alston during cross examination, and even more directly in his argument to the jury . . . ." (Objs. at 5 (citations omitted).) Indeed, Haskins argues that the prosecutor's behavior "is even *more* culpable than failure to correct perjured testimony coming from a third party witness, since it involves directly misleading behavior by the prosecutor himself." (Id.) Haskins insists that Napue applies to both the prosecutor's misleading examination of Alston and his false argument to the jury because "[i]t is ludicrous to suggest that whereas one may not present the jury with testimony known to be false, one may with impunity present the self-same false facts by dint of clearly focused cross-examination and direct argument." (Id.)

Haskins concedes that he did not explicitly raise this argument before the Superior Court and that he did not cite Napue as the authority for his argument to the Superior Court that he was entitled to relief because the prosecutor impeached Alston using a knowing falsehood. (Id. at 9.) However, he contends that he fairly presented this claim to the Superior Court by making an "argument to the Superior Court which clearly asserted the Commonwealth's deliberate falsehood." (Id. at 7.) Haskins relies on McCandless, in which the Third Circuit explained that, in order to fairly present a claim to the state court, the "petitioner must present a federal claim's

factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." 172 F.3d at 261 (citing <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982); <u>Picard v. Connor</u>, 404 U.S. 270, 277-78 (1971)). "It is not sufficient that a 'somewhat similar state-law claim was made.'" <u>Id.</u> (quoting <u>Harless</u>, 459 U.S. at 6). However, a petitioner can assert a federal claim in state court "without explicitly referencing specific portions of the federal constitution or statues." <u>Id.</u> (citation omitted). A petitioner can do so by:

> "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation."

<u>Id.</u> (quoting <u>Evans v. Court of Common Pleas, Delaware Cty., Pa.</u>, 959 F.2d 1127, 1232 (3d Cir. 1992)).

Haskins maintains that his PCRA counsel "rel[ied] on pertinent federal cases employing the <u>Napue</u> analysis, and . . . did in fact allege a pattern of facts that calls to mind <u>Napue</u> and is well within the mainstream of constitutional litigation." (Objs. at 9.) Haskins relies on an argument he made to the Superior Court that the prosecutor intentionally cross-examined Alston in a manner that falsely portrayed him as having recently fabricated his testimony that Cannon was the shooter in retaliation for Cannon having told the police that Alston was involved in unrelated homicides. However, while Haskins contends that his argument constitutes a "clear, mainstream <u>Napue</u> fact pattern" (<u>id.</u> at 10), we disagree. <u>Napue</u> concerned the conviction of a defendant through a prosecutor's knowing presentation of false evidence, including false testimony, to a jury. <u>See</u> <u>Napue</u>, 360 U.S. at 269. This case, however, does not involve the presentation of false evidence or false testimony to a jury. Haskins asks us to expand the holding and reasoning of <u>Napue</u> to encompass the conviction of a defendant through a prosecutor's

knowing use of misleading cross-examination and incorporation of falsehoods into his argument. Haskins, however, has cited to no authority to support the proposition that the holding of Napue has ever been applied in such a situation. We conclude, accordingly, Haskins did not allege a pattern of facts to the Superior Court that calls Napue to mind and that is "within the mainstream of constitutional litigation." McCandless, 172 F.3d at 261 (quotation omitted). We further conclude that Haskins' Napue argument was not fairly presented to the Superior Court through his arguments that that the prosecutor intentionally cross-examined Alston in a manner that falsely portrayed him as having recently fabricated his testimony that Cannon was the shooter.

Haskins also argues that his Napue claim was fairly presented to the Superior Court because he cited cases that cite Napue and its materiality standard. Haskins relies on his citations, in his Superior Court brief, to Giglio v. United States, 405 U.S. 150 (1972), Bagley, and Strickler v. Greene, 527 U.S. 263 (1999). All three of these cases cite Napue with respect to the standard of materiality that should be applied to a case in which the prosecutor knowingly used perjured testimony. See Bagley, 473 U.S. at 679 n.8 & n.9 (citations omitted); Giglio, 405 U.S. at 154 (quoting Napue, 360 U.S. at 271); Strickler, 527 U.S. at 289 n.19 (citing Napue, 306 U.S. at 269-70). However, Haskins did not cite Bagley, Giglio, or Strickler in his Superior Court brief to support an argument regarding the standard of materiality that should be used in a case in which the prosecutor knowingly used perjured testimony. See Brief of Appellee at 8, 11-13, Commonwealth v. Haskins, No. 1963 EDA 2011 (Pa. Super. Ct. Apr. 6, 2012). In these circumstances, the Superior Court could not have known that Haskins was asserting a Napue claim without following a "daisy chain" to divine that claim. See Howell v. Mississippi, 543 U.S. 440, 443-44 (2005) (stating that petitioner's state court brief did not properly present his federal law claim to the state supreme court because it relied on a "daisy chain -- which depends

upon a case that was cited by one of the cases that was cited by one of the cases that petitioner cited"); see also Edwards v. Rozum, 337 F. App'x 236, 239 (3d Cir. 2009) (agreeing that "[r]equiring courts to follow a 'daisy chain[]' to divine the federal constitutional claim is [an] insufficient presentation of the federal claim" (alterations in original) (quotation omitted)). We conclude that Haskins did not fairly present his claim that the Napue materiality standard applied to his case to the Superior Court through his citation to cases that cite Napue. Consequently, we overrule Haskins' objection to the Magistrate Judge's recommendation that his Napue claim is procedurally defaulted.

### 2. The application of *Napue* to Haskins' claims

Even though the Magistrate Judge recommended that Haskins procedurally defaulted his claim that the Superior Court's failure to utilize the materiality standard enunciated in Napue was contrary to clearly established federal law, he also considered the merits of that claim, and recommended that it does not have merit. Haskins objects to this recommendation, arguing that the Superior Court should have applied the Napue standard for materiality to his claim even though his case does not concern false testimony. As we mentioned earlier, Haskins contends that the actions of the prosecutor in his case, i.e., utilizing cross-examination and argument to falsely portray Alston as having recently fabricated his testimony that Cannon murdered Giles, "is even *more* culpable and prejudicial than failure to correct perjured testimony coming from a third party witness, since it involves directly misleading behavior by the prosecutor himself." (Objs. at 5.) Haskins further asserts that, because the prosecutor's behavior was so culpable, "the rationale of Napue applies even *more* cogently to the instant situation." (Id.) Haskins does not, however, explain this assertion, or cite any authority for the proposition that the Napue materiality standard applies in any case that does not involve the presentation of false evidence

to a jury.[2]  Consequently, we conclude that the Superior Court's failure to use the Napue

materiality standard in its analysis of Haskins' Brady claim was not "'contrary to' clearly

established federal law."  See Dennis, 834 F.3d at 280 (citing Williams, 529 U.S. at 405-06).  We

therefore overrule Haskins' objection to this aspect of the Magistrate Judge's Report and

Recommendation.  We also deny the Amended Petition with respect to Haskins' claims that the

Superior Court decision was contrary to clearly established federal law.

C.     The Superior Court's Determination of the Facts

Haskins argues in the Amended Petition that the Superior Court's conclusion that the

Alston letter was not material was based on an unreasonable determination of the facts in light of

the evidence presented and that the Superior Court unreasonably applied federal law to the facts

of his case.  As we discussed above, the Superior Court determined that the Alston letter was not

material based on "the overwhelming evidence of guilt in this case."  Haskins, 60 A.3d at 550.

Specifically, the Superior Court concluded that:

> Based upon the consistency and strength of the Commonwealth's case, it is clear
> that, had the defense been in possession of the letter, Alston's credibility would
> not have been rehabilitated to the point of overcoming the clear and consistent
> testimony of the two disinterested witnesses and the supporting physical evidence.
> While the jury was given the impression that Alston fabricated the story against

---

[2]Haskins cites Wearry v. Cain, -- U.S. --, 136 S. Ct. 1002 (2016) (per curiam), for the
proposition that the Napue materiality standard applies in any case in which the prosecutor
misled the jury in closing argument regarding a witness's motivation for his or her testimony.
However, while the Wearry Court quoted a passage from Giglio that was, itself, quoted from
Napue in explaining the materiality standard that applies to a Brady claim, the Supreme Court
also stated that, in order to succeed on his Brady claim, the petitioner was required to "show . . .
that the new evidence is sufficient to 'undermine confidence' in the verdict."  Weary, 136 S. Ct.
at 1006 (quoting Smith v. Cain, 565 U.S. 73, 75 (2012)).  Thus, in Weary, the Supreme Court
applied the standard of materiality for Brady clams enunciated in Kyles, 514 U.S. at 434, not the
Napue standard that Haskins argues applies to his claim.  Haskins also relies on Miller v. Pate,
386 U.S. 1 (1967) for the proposition that the Napue materiality standard applies in any case in
which a prosecutor argues a falsehood to the jury.  While the Supreme Court did cite Napue in
Miller, Miller, unlike the instant case, involved the presentation of false testimony to a jury and
thus does not support Haskins' argument.  See id. 386 U.S. at 6.

Cannon only after finding out that Cannon fingered Alston, the overwhelming evidence in this case compels our conclusion that the jury would not have reached a different verdict had Alston been rehabilitated with the letter, or if the Commonwealth never pursued that line of questioning.

Id. at 552.  The Superior Court based its conclusion on the following factual findings:

> Reviewing the evidence in its totality, we cannot conclude that, had the Commonwealth turned the letter over to the defense, there is a reasonable probability that the jury would have acquitted King and/or Haskins.  Both men were unequivocally identified on more than one occasion by S.T. and F.J.  Both knew the men from the neighborhood and were able to get a clear view of their faces as they executed the victim on the street.  S.T. and F.J. testified that the two men arrived in a vehicle, parked it on Cambria Street, and then fled in the same vehicle after the murder.  S.T.'s testimony was corroborated further by the medical examiner's testimony that the shot likely was fired from approximately one foot away.
>
> At the time of trial, Alston was facing two murder cases, an attempted murder case, and two robbery cases.  Each case involved the violent use of a firearm.  Alston was a member of the "Lemon Squad," a gang led by King.  Haskins also was a member of the "Lemon Squad."  Alston admitted his loyalty to King and Haskins.  His motive to fabricate his testimony was clear.  Alston's testimony substantially differed from that of S.T. and F.J.  Alston claimed there was only one actor near the victim when he was shot.  S.T. and F.J. testified that two men approached the victim.  Alston alleged that Cannon, after murdering the victim, fled on foot.  S.T. and F.J. consistently testified that the actors fled to the vehicle in which they had arrived, and used that vehicle to flee the scene.
>
> Among the credibility issues readily apparent with Alston, and arguably the most damning, was his declaration that the shot was fired from six to eight feet away.  Dr. Preston, an expert in forensic pathology, opined that, based on the forensic evidence left on the victim's head, the shot was fired from at most two feet away.  However, Dr. Preston believed that it was more likely that the shot was fired from only one foot away.  Alston's testimony was not only impeached by the divergence of his version of events from the versions of S.T. and F.J.; it also was contradicted by the forensic evidence in the case.

Id. at 551-52 (citation omitted).

In the Report and Recommendation, the Magistrate Judge recommended that some of the testimony of S.T. and F.J. that the Superior Court relied on as clear and consistent was actually contradictory and that the Superior Court's reliance on that testimony was objectively

unreasonable. However, the Magistrate Judge further recommended that "[a]lthough S.T.'s and F.J.'s testimony was not clear and consistent on all the facts, as found by the Superior Court, the court's remaining factual findings support its decision under the overarching standard of section 2254(d)(2)." (R&R at 15 (quotation and citations omitted).) Haskins objects to the Magistrate Judge's recommendation that the Superior Court's decision was not based on an unreasonable determination of the facts even though the Superior Court's reliance on the contradictory portions of the testimony of S.T. and F.J. was objectively unreasonable.

Pursuant to § 2254(d)(2), we may grant a petition for writ of habeas corpus "if the State court proceeding 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Saranchak v. Sec'y, Pa. Dep't of Corrs., 802 F.3d 579, 589 (3d Cir. 2015), cert. denied sub nom. Saranchak v. Wetzel, 136 S. Ct. 1494 (2016) (quoting 28 U.S.C. § 2254(d)(2)). "The State court's factual findings are 'presumed to be correct,' and [the petitioner] bears 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" Id. (quoting 28 U.S.C. § 2254(e)(1)). "But 'even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2).'" Id. (quoting Lambert v. Blackwell, 387 F.3d 210, 235-36 (3d Cir. 2004)).

Haskins contends that the Superior Court's finding that S.T. and F.J. both testified that King and Haskins arrived at the scene of Giles' murder by car and departed the scene in the same car, is not supported by the evidence. Haskins is correct that the evidence does not support the Superior Court's finding that "S.T. and F.J. testified that the two men arrived in a vehicle, parked it on Cambria Street, and then fled in the same vehicle after the murder." Haskins, 60 A.3d at

551-52. While both S.T. and F.J. testified at trial that they saw a car stop at the corner of Cambria and Tillman Streets and then drive down Cambria Street, both of them also testified that they were unable to see who was inside of the car. (6/19/06 N.T. at 182-85; 6/20/06 N.T. at 33-37.) In addition, the statements and testimony given by S.T. and F.J. regarding the departure of King and Haskins from the murder scene were not consistent. S.T. testified at trial that, while she was running across the street on her way home after the shooting, she saw King and Haskins get into a car parked on Cambria Street near the corner of Tillman Street and that the car subsequently backed up Cambria Street before stopping at the corner of Cambria and Tillman Streets. (6/19/06 N.T. at 194-198.) In S.T.'s February 23, 2005 statement to police, however, she told the police that after Giles was shot "[t]hese two guys ran down Cambria Street toward 26th Street." (Id. at 236, 240-41.) F.J. testified at trial that she and S.T. ran home after the shooting and that, when they were crossing Cambria Street, they almost got hit by the car that the shooters got into after the murder. (6/20/06 N.T. at 52-54.) However, on cross-examination she testified that she did not see the two men who did the shooting get into a car. (Id. at 107-08.) We conclude that the Superior Court's finding that "S.T. and F.J. testified that the two men arrived in a vehicle, parked it on Cambria Street, and then fled in the same vehicle after the murder," Haskins, 60 A.3d at 551-52, was objectively unreasonable since both S.T. and F.J. testified that they did not see who was in the car that they saw stop at the corner of Cambria and Stillman Streets and drive down Cambria and because they did not consistently testify that the two men departed in the same vehicle after the shooting.[3]

---

[3]We note that Magistrate Judge Rice also determined that the Superior Court's suggestion that "S.T.'s and F.J.'s testimony regarding King and Haskins' arrival and departure from the crime scene was clear and consistent" was objectively unreasonable because S.T.'s and F.J.'s testimony on this point was inconsistent. (R&R at 13-14.)

Haskins also contends that inconsistencies in the testimony of S.T. and F.J. with respect to the number of men and guns at the murder scene undermine the Superior Court's reliance on the "'consistency and strength' of the eyewitness testimony."[4] (Objs. at 17.) S.T. testified at trial to the following. She saw King, who was standing behind Giles, close enough to touch him, shoot Giles. (6/19/06 N.T. at 189-90.) She saw King point his gun at the back of Giles's head. (Id. at 190.) At that time, she saw Haskins standing by a one-way street sign. (6/19/06 N.T. at 191.) She heard Haskins say something before Giles was shot, but she did not remember what he said. (6/19/06 N.T. at 191-92.) S.T. heard four or five shots in all. (Id. at 192-93.) After S.T. saw King fire the first shot at Giles, she saw him move so that he stood over Giles and then she saw King shoot Giles again. (Id. at 193.) She saw only one of the two men with a gun. (Id. at 237.) However, when S.T. spoke with the police on February 23, 2005, she told the police that she "saw two guys with guns. Only one guy did the shooting." (Id. at 236.) Moreover, S.T. initially testified at the preliminary hearing that she saw Haskins give a gun to King, but subsequently testified, during the same hearing, that she never saw Haskins with a gun. (Id. at 243-44, 278, 287-89.)

F.J. testified at trial that she saw Haskins shoot Giles in the head from behind. (6/20/06 N.T. at 40-41.) She heard two shots, but she didn't see where the second shot hit Giles. (Id. at 41-42.) F.J.'s statements to police were inconsistent regarding the number of men she saw when

---

[4]Haskins agrees with the Magistrate Judge's determination that the Superior Court was objectively unreasonable in finding, based on S.T.'s statement to police, that Haskins encouraged King to shoot Giles by yelling "Shoot him, Shoot him." Haskins, 60 A.3d at 550. The Magistrate Judge based this determination on S.T.'s conflicting testimony during the preliminary hearing and at trial. (R&R at 13.) At the preliminary hearing, S.T. testified that she couldn't hear what was being said outside of the Chinese takeout. (6/19/06 N.T. at 230-32.) At trial she first testified that she didn't remember Haskins saying anything but, after reading her February 23, 2005 statement to police, she remembered hearing Haskins say "'Shoot him. Shoot him.'" (Id. at 192, 216-17, 230-32.)

Giles was shot. In her first statement to police, on the night of the shooting, F.J. said that she "saw this boy with a gun in his hand, and all of the sudden he just shot this man." (Id. at 55-56, 90, 93.) F.J. did not mention a second man at all during her first statement to police. (Id. at 103.) On April 16, 2005, she went to the Police Administration Building and identified photos of King, Haskins, Alston and Giles. (Id. at 69-79.) While she was there, she also told the police that King shot Giles and that Haskins was standing next to King during the shooting. (Id. at 72-73.) On April 16, 2005, F.J. also told the police that she saw Haskins "with the gun . . . but the other guy did the shooting. Then they both ran." (Id. at 74.)

The Superior Court did not comment on S.T.'s and F.J.'s testimony regarding the number of guns, and who held them. The Superior Court also did not mention this testimony in connection with its conclusion that "[r]eviewing the evidence in its totality, we cannot conclude that, had the Commonwealth turned the letter over to the defense, there is a reasonable probability that the jury would have acquitted King and/or Haskins." Haskins, 60 A.3d at 551. We conclude, accordingly, that the Superior Court did not rely on this testimony in support of its conclusion that the prosecution's failure to turn over the Alston letter did not violate Brady.

The Superior Court's remaining factual findings are uncontradicted. The Superior Court found that S.T. and F.J. both "unequivocally identified" King and Haskins, that they had a clear view of the mens' faces from the Chinese takeout, and that they knew King and Haskins from the neighborhood. Id. During the trial, S.T. identified King and Haskins as the men who approached Giles at the corner of Stillman and Cambria Streets and identified King as the shooter and Haskins as the man standing next to the one-way street sign. (6/19/06 N.T. at 186-91.) She also testified that she was able to see the faces of both men. (Id. at 203-05.) S.T. identified Haskins when she gave her statement to the police on February 23, 2005, and

identified King, and told police that she had seen King around the neighborhood, when she gave additional statements to the police on March 14, 2005 and April 16, 2005. (Id. at 213, 217-18, 222-27.) During the trial, F.J. identified King as the man who shot Giles and stated that, on the night of the murder, she could see him from inside of the Chinese takeout. (6/20/06 N.T. at 40, 49-50.) As we mentioned above, F.J. also identified both King and Haskins and described their respective roles in Giles's murder when she gave her statement to the police on April 16, 2005. (Id. at 69-70, 72-73.)

The Superior Court's finding that "[a]t the time of trial, Alston was facing two murder cases, an attempted murder case, and two robbery cases," Haskins, 60 A.3d at 552, is also uncontradicted. Alston admitted during the trial that he had "five open criminal cases" and that he had been charged with two separate murders, robbery and conspiracy. (6/21/06 N.T. at 113-15.) The Superior Court's finding that Alston was a member of the "Lemon Squad" and was loyal to both King and Haskins, Haskins, 60 A.3d at 552, is also uncontradicted. Alston testified at trial that he was a close friend of Esheem ("Sheem") Haskins and Jerome ("Lemon") King; that he and Haskins were both members of "Lemon's Squad[;]" and that he was loyal to King and Haskins. (6/21/06 N.T. at 107-08, 112, 228.)

The evidence at trial also unequivocally supports the Superior Court's findings that "S.T.'s testimony was corroborated . . . by the medical examiner's testimony that the shot likely was fired from approximately one foot away," and that "[a]mong the credibility issues readily apparent with Alston, and arguably the most damning, was his declaration that the shot was fired from six to eight feet away." Haskins, 60 A.3d at 552. S.T. testified at trial that King was behind Giles, close enough to touch him, when he started shooting. (6/19/06 N.T. at 189-90.) The medical examiner, Dr. Bennett Preston, testified, based on gunpowder stippling, that the first

gunshot, the one that went into the back part of Giles's right ear and into the back of his head, came from a gun fired within two feet of Giles's head and most likely within a foot of Giles's head. (Id. at 127-29, 131-32.) Alston, however, testified that Cannon was between six and eight feet away from Giles when he shot him the first time. (6/21/06 N.T. at 138-39.)

We conclude, based on the uncontradicted facts relied on by the Superior Court in reaching its conclusion that the Alston letter was not material for purposes of Brady, that the Superior Court's conclusion was not based on an unreasonable determination of the facts in light of the evidence presented. See Lambert, 387 F.3d at 235-36 ("In the final analysis . . . even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2)."). We therefore overrule Haskins' objection to this aspect of the Magistrate Judge's Report and Recommendation.

Haskins also argues that the Superior Court unreasonably applied federal law to the facts in this case in reaching its conclusion that the Alston letter was not material for purposes of Brady. See Haskins, 60 A.3d at 552. In making this argument, Haskins discredits the eyewitness testimony, minimizes the differences between Alston's testimony and that of the medical examiner regarding the distance of the shooter from Giles, and asserts, without foundation, that Alston's pending cases "would have resulted in testimony *favorable to the Commonwealth rather than to the defendants.*" (Objs. at 20.) He also suggests that the prosecution had an obligation to investigate Alston's accusation of Cannon by showing the witnesses a picture of Cannon. Haskins further asserts that the manner in which Alston first accused Cannon, in a letter written before he was arrested, suggests his veracity. We conclude that this unsupported argument is insufficient to establish that the Superior Court unreasonably

applied federal law when it concluded that the Alston letter was not material and that Haskins had not satisfied the third element of Brady, that is, the requirement that the withheld evidence be "material to guilt or punishment."  See Risha, 445 F.3d at 303 (citations omitted).  We therefore overrule Haskins' objection to this aspect of the Magistrate Judge's Report and Recommendation.  We also deny the Amended Petition with respect to Haskins' claim that the Superior Court's decision was based on an unreasonable determination of the facts in light of the evidence and involved an unreasonable application of clearly established federal law.

IV.    CONCLUSION

For the foregoing reasons, we overrule each of Haskins' objections and adopt Magistrate Judge Rice's Report and Recommendation in its entirety.  In addition, as Haskins has failed to make a substantial showing of the denial of a constitutional right or demonstrate that a reasonable jurist would debate the correctness of this ruling, we decline to issue a certificate of appealability under 28 U.S.C. § 2253(c)(2).  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova

_____
John R. Padova, J.